Gallegos v Elite Model Mgmt. Corp. (2004 NY Slip Op 50000(U))

[*1]

Gallegos v Elite Model Mgmt. Corp.

2004 NY Slip Op 50000(U)

Decided on January 6, 2004

Supreme Court, New York County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 6, 2004

Supreme Court, New York County,
 VICTORIA GALLEGOS, Plaintiff,
against
ELITE MODEL MGMT. CORP., JOHN CASABLANCAS, GERALD MARIE, MARY ANN D'ANGELICO and MONIQUE PILLARD, Defendants.
Index No. 120577/00

Plaintiff's Attorney:
Brill & Meisel, Esqs.
488 Madison Avenue
New York, NY 10022 By: Rosalind S. Fink, Esq.
(212) 753-5599
Beldock, Levine & Hoffman, LLP
99 Park Avenue
New York, NY 10016 By: Robert Herbst, Esq. Co-counsel for plaintiff
(212) 490-0400
Defendants Monique Pillard & John Casablancas:
Gersten, Savage, Kaplowitz, Wolf & Marcus, LLP
101 East 52nd Street
New York, NY 10022 By: Robert S. Wolf and Marc R. Rosen
(212) 752-9700
Defendants Elite Model Mgmt. Corp., Gerald Marie & Mary Ann D'Angelico
McLaughlin & Stern, LLP
260 Madison Avenue
New York, NY 10016 By: Paul H. Levinson, Esq.
(212) 448-1100
and
Edward R. Curtin, P.C.
288 Lexington Avenue
New York, NY 10016-3565By: Robert I. Goodman, Esq.
(212) 686-6744

LOUIS B. YORK, J.
Introduction
This is a motion under CPLR 4404 to set aside a jury verdict in favor of the plaintiff and either to award judgment N.O.V. to defendant or to order a new trial. While the Court holds that [*2]there was sufficient evidence to justify the verdict on liability, the pain and suffering damage award is excessive requiring a new trial on damages unless the plaintiff agrees to a reduced damages award.
The plaintiff was hired by the defendant modeling agency in an executive capacity. The president of the company, defendant John Casablancas, had seen an article describing her success with the exclusive womens' fashion boutique, Prada, and believed her bouyant personality would revive the sagging morale of the company's booking agents ("bookers") and the increasing tendency of its super models to leave for greener pastures. If things worked out, she could be groomed to replace Casablancas as the chief executive officer.

The Employment Situation
Things didn't work out. Plaintiff had initially informed the defendants, before she was hired and consistently thereafter, that she suffered from asthma and sensitivity to smoke and needed to be in a smoke-free environment. She was assured that this would not be a problem. Casablancas also conceded that he knew the law at that time prohibited smoking in public areas of the premises and that the company had an obligation to make accommodations for disabilities like the plaintiff's asthma. A couple of memos did go out informing staff of the anti-smoking laws. But faced with stiff resistence from the bookers and the models, defendants did not seriously continue to enforce the no-smoking laws. The plaintiff was required to sit with the heaviest smoking bookers. In the meantime, plaintiff became more ill from the smoke and evidence was produced tending to show that the aggravated asthma eventually caused her to contract chronic sinusitis.
Defendant Marie, at that time the head of foreign operations of the Elite Model Management family, and functioning as a consultant to the New York operation, continued to smoke while meeting with the plaintiff. Plaintiff was also made to endure practical jokes by employees who placed a lighter and matches on her desk.
During the period of her employment, the plaintiff testified that she had several asthma attacks, and suffered from shortness of breath, coughed up bloody, greenish-white mucous, had frequent headaches, was nauseous, had frequent pain around her eyes and nose as well as a sore throat, loss of smell and clogged ears. When defendants were finally informed that she intended to confer with her lawyer after it was suggested that she consider employment elsewhere, they fired her.
The Lawsuit
Following plaintiff's firing, this lawsuit was instituted. Plaintiff claims that the provisions of the state and city Human Rights Laws requiring the employers to make accommodations for persons with disabilities were violated. She also claims damages for the defendants' firing of her in retaliation for plaintiff's assertion of her rights under the Human Rights Laws, including subjecting her to a hostile work environment.
The Trial and Verdict
The trial was bifurcated. After a six-week trial, the jury found in favor of the plaintiff on liability resulting from; (a) failure to accommodate plaintiff's disability; (b) retaliatory discharge; (c) subjecting her to a hostile work environment; and (d) punitive damages.
At the conclusion of the liability phase of the trial, plaintiff's counsel asked the Court not to discharge the two alternates but to hold them on call in case any juror suddenly became unavailable. The record reveals that while the Court was initially reluctant to do so, it decided to grant the request given the length, expenses of the trial and the investment of time by all parties including the Court. [*3]There was no objection to this decision. Approximately two weeks later after the damages phase had concluded and the jury had been deliberating for a few hours, two of the jurors requested permission to speak with the Court. In that discussion, juror Yanoseck revealed that she had met defendant D'Angelico on two occasions in the public ladies bathroom. The first encounter did not result in any substantive discussion. On the second encounter, however, D'Angelico imparted information that the Court had previously excluded. The other juror, an attorney, had been consulted by her and it was at his insistence that they met with the Court. Although the Court expressed some doubts about whether the alternates could be substituted after deliberations had gotten underway, both jurors repeatedly gave assurances that they had not imparted any of this information to any of the other jurors. When I stated to Ms. Yanoseck that she had no business being in the public bathroom when bathrooms were set aside for the jurors, she stated that there was another juror whom I should also give that instruction to. That was understood to merely mean that she was not the only one of the jurors using the public bathroom. Since they assured us that they had not discussed this with the other jurors and Ms. Yanoseck did not say that this other juror was in the bathroom at the time of her second conservation with D'Angelico, I did not pursue this with the other jurors; neither did any of the other attorneys request that I do so. These two jurors were then discharged.
The record reveals equivocation by the defense attorneys when at the end of the trial on liability, the Court decided to keep the alternate jurors on call. At one point, one of them said that it would be a shame if after all this time we would have to start over and the decision was up to the Court. While the other said that he wished he had more time for research before he would consent to the procedure. No one stated an objection so I decided to recall the two alternates. I then instructed the jury to disregard everything that had transpired during their previously short deliberation. They were to start from scratch and to treat every matter raised as if being raised for the first time. During all of this, defendants' counsel raised no objection.
During oral argument on this motion, the Court asked Mr. Wolfe, counsel for Elite why they only obtained juror Yanoseck's affidavit. What about the juror whom she claimed had overheard her conversation with D'Angelico? He claimed she couldn't be found. Strangely, plaintiff's counsel was able to find that witness and submit her affidavit which stated that she heard no such conversation and no discussion about it was held by the deliberating jurors.

Decision
The defendants do not seriously question that they failed to accommodate plaintiff's disability. At one point, they weakly responded that they did not know that they were violating state and city Human Rights Laws. However, Casablancas, the president of defendant Elite, admitted that he knew he had a responsibility to accommodate her asthma. The record reveals that he made a few feeble efforts to do so, but afterwards basically gave up. There is no way that this Court could find for the defendants as a matter of law. The standard is whether there is no valid line of reason which could lead a rational jury to the conclusion reached (Schwartz v Minkoff, 308 AD2d 484, 486,764 NYS2d 285,286 [2nd Dept 2003]). On the facts in the record, this branch of the motion must be denied. However, the standard for setting aside the verdict on liability and ordering a new trial is that the verdict is contrary to the weight of the evidence, id. On this record, there is no basis for granting this branch of plaintiff's motion. Nothing in the defendant's submissions challenges the jury's determination that the defendants failed to accommodate plaintiff's disability. Neither is there any challenge to the determination that plaintiff was subjected to a hostile work environment. On [*4]these two bases alone, the jury was able to go on to determine damages.
While there is no necessity to determine whether plaintiff's termination was retaliatory given defendants' liability under the Human Rights Laws for failure to provide plaitiff with a reasonable accommodation and subjecting her to a hostile work environment, the Court will briefly discuss this issue. Defendants claim that since plaintiff never stated that she was asserting rights under the Human Rights Laws, these laws cannot be invoked. To establish a claim, plaintiff must show (1) that she was engaged in a protected activity, which defendants do not challenge, and plaintiffs were aware of such protected activity for which there was evidence resulting from the conversations with defendants concerning her asthma and her smoke sensitivity. Plaintiff also showed that it was her assertion of her rights regarding this activity together with her letter informing them of her need to consult an attorney that led to her dismissal. These facts are sufficient to have allowed a reasonable jury to determine that her firing was retaliatory (Pace v Ogden Services Corp., 257 AD2d 101, 104 [3rd Dept 1999]). Plaintiff need not specifically assert that she is asserting rights under the Human rights Law. So long as she informed the defendants of her disability and her need for an accommodation - which plaintiff did - she has satisfied the statutes, (see, Engstrom v Kinney System, 241 AD2d 420, 423-424 [1st Dept 1997]).

Damages
(A) Pain and Suffering
The jury awarded $2,000,000 for past and future pain and suffering. In determing whether to uphold or set aside a compensatory damages award, the Court must determine whether it is a material deviation from what is reasonable compensation, CPLR 5501 (c); Carl v Daniels, 268 AD2d 395, 702 NYS2d 279 [1st Dept 2003]). The substantial physical symptoms that plaintiff suffers from were set forth in the beginning pages of this decision. There does not appear to be any reported cases in NewYork discussing the compensation that plaintiff would be entitled to for the physical results emanating from the aggravation of her asthma condition and the development of chronic sinusitis. The plaintiff has located an out-of-state case, (New Havenford Partnership v Stroot, 772 A2d 792 (Del 2001]), in which an award of $1,000,000 in compensatory damages where exposure to mold permanently increased the severity of the plaintiff's asthma and caused headaches, sinus problems, chest pains, body aches and cognitive deficits. As the defendants pointed out, that plaintiff's exposure was 21 months and she was forced to go to the emergency room seven times and spent nine days in the hospital. Although plaintiff's injuries were less severe, one would expect that New York would award higher amounts of money for personal injuries than Delaware. Moreover, plaintiff suffered additional psychological injuries resulting from the hostile work environment, the tension resulting from the impending termination and the termination itself. These factors should justify an award for past pain and suffering of $600,000 and future pain and suffering of $500,000 for a total award of $1.1 million.
(B) Punitive Damages
The challenge to punitive damages goes to both the award in the liability stage as well as the damages phase. The most serious issue is whether punitive damages can be upheld when the jury has held that all of the senior staff were not liable for punitive damages but the corporation was found to be liable. While the Court was initially reluctant to permit the consideration of punitive damages, upon reexamination of the PJI charge and further reflection, the Court concludes that consideration of punitive damages was appropriate. The charge, to which the defendants never [*5]objected, in addition to stating that punitive damages may be awarded against the corporation if its officers or directors participated in the wanton, reckless or malicious acts, also stated that punitive damages could also be awarded if they consented, authorized or ratified such acts. Therefore, even if none of the officers themselves were liable because their acts individually did not amount to punitive damages, the totality of acts by them and their employees could give rise to corporate liability if they did very little to suppress them (Gruon v Associated Dry Goods Corp., 43 NY2d 876, 878, 403 NYS2d 465 [1978]), cited in the Elite reply brief, is not to the contrary. There, the finding of punitive damages against the corporation was vacated because the evidence was insufficient to support a finding of punitive damages against all three employees through whom the store acted. In this case, there were not only the officers and directors who acted, but the bookers and models who continued to smoke in spite of their knowledge of plaintiff's disabilities and who also played cruel practical jokes on the plaintiff. This behavior was tolerated by the individual defendants and to some extent participated in by them.
The evidence adduced at trial was certainly sufficient to justify an award of punitive damages. Under State Farm v Cambell, 538 US 408, 155 L.Ed2d 585 [2003], due process considerations make it necessary to consider the fairness of the awards. The most important consideration is the reprehensibility of the conduct. The repeated failure to observe the non-smoking law in the light of petitioner's disabilities and the tolerance of cruel practical jokes evinced a reckless disregard for the plaintiff's physical health and was reprehensible. We are also instructed to consider the disparity between the harm endured by plaintiff and the difference between the punitive damages awards and the civil damages awards in similar cases. The Court holds that the reprehensibility of the defendants' conduct, combined with a $2.6 million award for punitive damages as compared to a $1.1 million dollar award for pain and suffering fully satisfied due process.

Failure to Object
The defendants have also pointed to a number of instances in which they state that the Court took erroneous actions, thereby committing reversible error. For instance in not following up on the statement of a discharged juror that it should tell another juror not to use the ladies bathroom. Yet, none of the litigants requested that the Court follow up on this request. Defendants also charge that this act caused them to lose two favorable jurors, who were replaced by jurors not favorable to them. Once again, no objection was made to the discharge of these jurors or their replacements. Incidentally, defendants were not entitled to favorable jurors, only impartial ones. There is nothing in the record to show that the replacement jurors were not impartial. The same failure to object for the rather harmless comment to the jurors that the discharged jurors did not do anything seriously wrong was not preserved for the record. These and a number of other similar instances in which the defendants failed to object, they now raise as a reason to vacate the verdict. This cannot be done because none of these objections were preserved, thereby failing to give the Court any opportunity to correct its mistake, if there was one (Califano v The City of New York, 212 AD2d 146, 627 NYS2d 1008 [1st Dept 1995]).
Plaintiff's arguments that the trial Court committed reversible error in not discharging the alternate jurors once deliberations began, as required by CPLR 4106, and that she was denied due process by reason of the contact between the regular jurors and the alternates after deliberation are not preserved ...
***
[*6]
...the trial judge clearly informed the jurors that the regulars were to begin deliberations while the alternates were to be separated from them and were not to discuss the case at all. None of the parties objected during or after the discussions and instructions on this subject. Only after the verdict was read, did plaintiff claim that the regulars and alternates commingled.
Fader v Planned Parenthood, 278 AD2d 41, 41-42, 717 NYS2d 166, 167 [1st Dept 2000]
To be preserved, the objection must be "unambiguous" in order to give sufficient notice "to frame a response, and afford[s] the Court an opportunity to frame a ruling" (People v Bierenbaum, 301 AD2d 119, 152, 748 NYS2d 564 [1st Dept 2002]).
After Acquired Evidence
Defendants challenge the jury's failure to take into account after acquired evidence in reducing the award for economic damages, claiming that they would have fired plaintiff had they known she had lied on her application. The jury apparently decided on the evidence that was available to it, that since the plaintiff was hired before she filled out the application, and the omitted information was of no consequence. Nobody even looked at the application, see, McKennon v Nashville Banner Publishing, 513 US 352, 362-363, 130 L.Ed2d 852 [1995]). Defendants also insist that had they known that plaintiff was surreptitiously recording their conversations with her they would have fired her. The plaintiff claims, on the other hand, that defendants were fully aware of this activity which she used to help her in the learning process for this new undertaking. The Court notes that recording such conversations by one of the participants is perfectly legal activity, (Penal Law §250.00).
Moreover, the recordings were the result of protected activity if they were used to acquire evidence of discriminatory activity (Grant v Haslett, 880 F2d 1564, 1569-1570 [2nd Cir 1989]). Therefore, despite the defendants' contention, the Court's charge with the above rule was correct.
The Court has considered defendants' remaining arguments and has found them to be without merit. Accordingly, the defendants' motions are decided as follows:
It is
ORDERED that the damages awarded by the jury for pain and suffering is vacated and a new trial is ordered on this issue unless the plaintiff agrees to reduce the award for pain and suffering to $1,100,000 (one million, one hundred thousand dollars) in writing within 30 (thirty) days of the service of a copy of this order with Notice of Entry; and it is further
ORDERED that in all other respects the verdict is upheld.

Dated: ______________
Louis B. York, J.S.C.
Decision Date: January 06, 2004